The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments on appeal. The appealing party has shown good grounds to amend the holding of the Deputy Commissioner. The Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
Prior to the hearing before the Full Commission, plaintiff submitted a motion to take additional medical evidence from Dr. Stephen Furr. It appearing that plaintiff began treatment with Dr. Furr subsequent to the hearing before the Deputy Commissioner and it appearing that Dr. Furr diagnosed plaintiff with bilateral carpal tunnel syndrome and performed surgical releases, consideration of Dr. Furr's opinions are required for a full presentation of the evidence and the proper administration of justice, plaintiff's motion must be, and hereby is GRANTED. The 9 August 2000 affidavit of Dr. Furr and attached materials are HEREBY ADMITTED into evidence in this matter.
 *********** STIPULATIONS
1. At the time of the alleged contraction of the occupational disease, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the alleged contraction of the occupational disease, an employer-employee relationship existed between plaintiff and defendant-employer.
3. At the time of the alleged contraction of the occupational disease, defendant-employer was a qualified self-insured, with Gallagher Bassett acting as its third-party administrator.
4. The employee's average weekly wage pertinent to this claim is $398.40.
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner plaintiff was 41 years old and had a GED. Plaintiff has training as a firefighter and work experience as a custodian and landscaper as well as in the manufacturing business.
2. In September 1991, plaintiff became employed as a part-time firefighter with defendant-employer, the City of Lexington. During this time, plaintiff was also employed as a full-time custodian for Lexington City Schools. Lexington City Schools is not affiliated for workers' compensation purposes with the defendant in this case.
3. In July 1995, plaintiff began working as a full-time firefighter for the City of Lexington. The work schedule for a firefighter was 24 hours on-duty followed by 48 hours off-duty. During the 24-hour work period, a firefighter engages in a variety of scheduled and unscheduled activities and responds to emergencies as they occur.
4. The position of a firefighter includes planned activities scheduled from 7:00 a.m. to 5:00 p.m. Monday through Friday. These activities include a morning meeting, a brief period of optional individual exercise, classroom and practical training, inspections of local businesses and public service educational programs and presentations at day care centers, nursing homes and schools. Firefighters also receive a one-hour lunch break during this time. Scheduled activities are followed by dinner and a brief period of cleaning and completion of reports. The remaining 12 to 13 hours of the workday is free time and no activities are scheduled during this period. Very few activities are scheduled Saturdays and Sundays. The vast majority of time on Saturdays and Sundays is free time. Defendant did not expressly require weight lifting, but weight equipment was provided and many of the firefighters, including plaintiff, used weight-lifting equipment in the fire station with the full knowledge of defendant. Firefighters were required to maintain a level of physical fitness.
5. By providing weight-lifting equipment at the fire station with the understanding that it would be used by firefighters who were on duty to maintain required levels of physical fitness, defendant fostered a work environment in which firefighters were encouraged to lift weights while on duty.
6. In addition to the daily scheduled activities, one time per month firefighters participated in a "hot drill" which is a practice session of a particular skill such as utilizing a ladder or hose. These drills last from five minutes to one hour.
7. Firefighters respond to 150 to 200 emergency calls per year. The majority of these calls do not involve fires and during two-thirds of the calls firefighters take minimal or no action. Out of the emergency calls, only two to three per month involve fires and of these, on average one per month involves a structural fire.
8. During the structural fires, which occur approximately one time per month, firefighters use the hose to put out the fire for approximately five to twenty minutes. Thereafter, the firefighters use a variety of tools including a pipe pole to knock down ceilings, shovels, brooms, ladders and saws. On average, the firefighting operation lasts no more than two hours.
9. In the summer of 1997, plaintiff began experiencing recurrent pain and numbness in his hands and arms. Initially, plaintiff did not relate this condition to his job as a firefighter.
10. In December 1997, plaintiff received treatment from Dr. Jonathan Hinson who diagnosed recurrent numbness in the hand and arm and referred plaintiff to Dr. Chester C. Hayworth, a neurologist.
11. Dr. Hayworth began treating plaintiff in January 1998 and diagnosed carpal tunnel syndrome that he treated conservatively for a brief period of time. Nerve conduction studies confirmed the diagnosis of carpal tunnel syndrome. Dr. Hayworth referred plaintiff to Dr. Bryan Noah, an orthopedic surgeon. Dr. Noah treated plaintiff throughout 1998 with injections and medication.
12. Following conservative care with Dr. Noah, plaintiff received treatment from Dr. Gary G. Poehling beginning in February 1999. Dr. Poehling is a board-certified orthopedic surgeon with an added qualification in hand surgery as well as the Chairman of Orthopedic Surgery at Wake Forest University Medical Center. Dr. Poehling diagnosed bilateral carpal tunnel syndrome and chronic regional pain syndrome and recommended bilateral carpal tunnel releases. Plaintiff underwent a left carpal tunnel release on May 4, 1999 and a right carpal tunnel release on August 4, 1999.
13. Plaintiff went out of work as of the date of the left carpal tunnel release on May 4, 1999. Following post-operative treatment, Dr. Poehling released plaintiff to return to work as of August 30, 1999 with certain restrictions. Dr. Poehling thereafter categorized plaintiff as being able to work only in the light duty category, and Dr. Poehling released plaintiff as of November 1, 1999 with lifting restrictions and restrictions on repetitive motion. As of the date of the hearing, plaintiff had not returned to employment.
14. Dr. Poehling rated plaintiff with a 15% permanent partial disability to the right hand and a 15% permanent partial disability to the left hand.
15. Dr. Stephen Furr evaluated plaintiff on 7 March 2000. Several diagnostic tests taken at that time indicated bilateral carpal tunnel syndrome. Dr. Furr performed a second left carpal tunnel release surgery on 13 April 2000. Dr. Furr performed a second right carpal tunnel release surgery in June 2000.
16. Plaintiff's carpal tunnel syndrome was caused by his employment with defendant.
17. Plaintiff's employment with defendant placed him at an increased risk of developing carpal tunnel syndrome as compared to members of the general public not so employed.
18. During his time out of work, plaintiff has received short-term disability benefits, fully funded by the employer.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome is due to causes and conditions characteristic of and peculiar to his employment with defendant, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C.G.S. 97-53(13).
2. At the time of plaintiff's contraction of an occupational disease, plaintiff's average weekly wage was $398.40, yielding a compensation rate of $265.60. N.C. Gen Stat. 97-2(5).
3. As a result of his contraction of a compensable occupational disease, plaintiff is entitled to total disability compensation at the rate of $265.60 per week from 4 May 1999 and continuing until plaintiff returns to work or further order by the Commission. N.C. Gen Stat. 97-29.
4. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of the compensable injury by accident. N.C. Gen Stat. 97-25.
5. Defendant is entitled to a deduction against plaintiff's total disability compensation for the amount defendant has paid plaintiff as part of the employer-funded disability plan.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Subject to the deduction of counsel fees hereinafter approved, defendant shall pay plaintiff compensation benefits at a rate of $265.60 per week beginning 4 May 1999 and continuing until plaintiff returns to work or further order by the Commission. Any amount that has accrued shall be paid in a lump sum.
2. Defendant shall receive a deduction from the compensation to be paid plaintiff for the amount defendant has paid plaintiff as part of the employer-funded disability plan.
3. Defendant shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of the compensable occupational disease.
4. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff under Paragraph 1 of this AWARD shall be deducted from that sum and paid to plaintiff's counsel. Thereafter, every fourth check for compensation shall be paid directly to plaintiff's counsel.
5. Defendant shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER